# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEVEN H. BUSCH, Derivatively and On Behalf of RICHARDSON ELECTRONICS, LTD., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0868-AGB |
| EDWARD J. RICHARDSON, PAUL PLANTE, JACQUES BELIN, JAMES BENHAM, KENNETH HALVERSON, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| RICHARDSON ELECTRONICS, LTD., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  September 21, 2018
Date Decided:  November 14, 2018

Peter B. Andrews, Craig J. Springer, and David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeffrey Norton and Roger A. Sachar, NEWMAN FERRARA LLP, New York, New York; Peter Safirstein and Elizabeth S. Metcalf, SAFIRSTEIN METCALF LLP, New York, New York, *Attorneys for Plaintiff Steven H. Busch*.

Blake Rohrbacher, Kevin M. Gallagher, and John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants Paul Plante, James Benham, and Kenneth Halverson.*

P. Clarkson Collins, Jr., MORRIS JAMES LLP, Wilmington, Delaware, *Attorney for Defendant Edward J. Richardson.*

Garrett B. Moritz and Roger S. Stronach, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, *Attorneys for Defendant Jacques Belin and Nominal Defendant Richardson Electronics, Ltd.*

**BOUCHARD, C.**

This case arises out of three transactions in which Richardson Electronics, Ltd. repurchased shares of its stock in 2013 and 2014 from its Chairman and Chief Executive Officer and a charity he controlled. The transactions were not disclosed as related-party transactions in the company's public filings until August 2015. About one year later, after obtaining books and records from the company concerning the repurchases, a stockholder of the company (Steven H. Busch) demanded that the company take action to unwind the transactions and, if necessary, initiate litigation to rescind them.

In response to Busch's demand, the company's board of directors formed a special committee of outside directors to investigate the transactions. The special committee retained independent counsel, which requested and received access to documents, conducted interviews, met with the special committee on a regular basis, and prepared a 30-page report summarizing the committee's findings. The special committee concluded in its report that it did not believe that a factual basis existed on which to initiate action against any director or officer, but expressed concerns about the accuracy of certain of the company's disclosures to stockholders.

On May 9, 2017, about two months after the special committee completed its report, the company's board informed Busch that it was declining to take any action in response to his demand. On December 5, 2017, Busch filed this action, asserting a single claim for breach of fiduciary duty against the five current members of the

1

company's board for failing "to properly disclose [the transactions] to stockholders or take action to recover damages as a result of [the CEO's] breaches of fiduciary duty" after the directors had determined that the transactions were the result of a flawed process.[1]  All defendants have moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6).

For the reasons explained below, the court concludes that the Complaint fails to plead particularized facts that raise a reasonable doubt about the board's good faith or due care in rejecting the demand based on the special committee's investigation.  Under well-established precedent, therefore, the Complaint fails to meet the test for demonstrating that the board's refusal of Busch's demand was wrongful.  But there is an additional wrinkle in this case.

Busch contends that he should not be deemed to have conceded that a majority of the board was independent and disinterested by virtue of making his demand, as our demand refusal case law instructs.  Busch argues it would be unfair to imply such a concession in this case on the theory that the company misled him before he made his demand to believe that the transactions were effectuated by a third-party broker under a repurchase plan and that the board had no involvement in dictating the timing or pricing of the transactions when, according to the special committee's

---

[1] Verified Stockholder Derivative Complaint ("Complaint") ¶ 176.

report, that turned out not to be true. Given these circumstances, Busch argues that the court should apply the two-part test our Supreme Court articulated in *Zapata Corp. v. Maldonado*[2] to decide defendants' motions to dismiss under Rule 23.1.

The record reflects that the company did make inaccurate factual representations to Busch before he made his demand, but it is unclear whether he actually relied on those representations in deciding to make his demand. It is not necessary to attempt to resolve this factual dispute, however, because even if defendants' Rule 23.1 motion were evaluated as if Busch never made his demand, the Complaint fails to plead particularized facts raising a reasonable doubt about the independence or disinterestedness of a majority of the directors on the board.

As discussed below, the court performs this analysis by applying the test for determining demand futility. The court declines Busch's request to apply the *Zapata* test, which is designed to address a specific scenario not present here, *i.e.*, where a committee of directors seeks to dismiss a derivative claim when a board is conflicted and making a demand would be excused.

For these reasons, as further explained below, the court grants defendants' motions and dismisses the Complaint with prejudice.

---

[2] 430 A.2d 779 (Del. 1981).

## I.  BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Complaint and documents incorporated therein.[3]  Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

Among the documents incorporated into the Complaint is the March 9, 2017 Report of the Special Committee of the Board of Directors of Richardson Electronics, Ltd. Prepared with the Assistance of Richards, Layton & Finger, P.A. (the "Report"), which is quoted extensively in and attached to the Complaint.  The Complaint also refers to two separate requests to inspect books and records that Busch made under 8 *Del. C*. § 220.  The first was made on October 13, 2015 (the "First Section 220 Request"), before Busch made a litigation demand, and the second was made on May 17, 2017, after the Report was issued (the "Second Section 220 Request").[4]

---

[3] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss) (citations and internal quotations omitted).

[4] In connection with his Second Section 220 Request, Busch entered into an agreement with the Company that provides, in relevant part, that if he were to use in a complaint any information provided to him in response to that request, "all information provided by the Company to the Stockholder . . . shall be deemed incorporated by reference into such complaint . . . with the effect that the Company and its directors and officers may refer to any information or document provided by the Company to the Stockholder in response to the [Second Section 220 Request] in any court filing they make and the court may properly consider such information or document(s) in any decision it makes." Special Committee Defs.' Opening Br., Ex. 1 ¶ 10.

4

## A.    The Parties

Richardson Electronics, Ltd. ("Richardson Electronics" or the "Company") is a Delaware corporation with its principal place of business in La Fox, Illinois. The Company is a global provider of engineered solutions, power grid and microwave tubes, and related consumables. Its stock is divided into two classes: Class B shares have 10 votes per share, and Class A shares have 1 vote per share. Plaintiff Steven H. Busch attests that he has been a stockholder of the Company since at least June 3, 2014.[5]

The defendants consist of five individuals who were members of the Company's board of directors (the "Board") on August 10, 2016, when Busch made a demand that the Board unwind the three stock repurchase transactions at issue in this case (the "Transactions") and, if necessary, commence legal proceedings to rescind them (the "Demand").[6] They also were on the Board on December 5, 2017, when this action was filed.[7]

Defendant Edward J. Richardson ("Richardson") is the Chairman, President, and CEO of Richardson Electronics, which was founded by his father.[8] He owns roughly 99% of the Company's Class B stock, which entitles him to approximately

---

[5] Compl. Exs. E, I (verifications of Steven H. Busch).

[6] *See* Compl. ¶¶ 24-29 & Ex. A 1-5.

[7] Compl. ¶ 29.

[8] *Id.* ¶ 24.

65% of the voting power of the Company's outstanding common stock.[9] Richardson also is the President of the Richardson Wildlife Foundation, a charity he allegedly controls (the "Wildlife Foundation").[10]

Defendant Paul Plante joined the Board in October 2011 and was on the Board when all of the challenged Transactions occurred.[11] He became Chairman of the Compensation and Governance Committee at some point after October 2013.[12] The remaining three defendants—Jacques Belin, James Benham, and Kenneth "Chip" Halverson—joined the Board in October 2013.[13] Belin and Benham did not serve on any of the four standing committees of the Board.[14] Halverson has served on the Board's Audit Committee, Compensation and Governance Committee, and Nominating Committee.[15] Plante, Benham, and Halverson were the three members of a special committee that was formed to investigate the matters in the Demand (the "Special Committee"), with Plante serving as its Chairman.[16]

---

[9] *Id.*

[10] *Id.* ¶¶ 1, 24.

[11] *Id.* ¶ 25.

[12] *Id.*

[13] *Id.* ¶¶ 26-28.

[14] *Id.* ¶¶ 26-27.

[15] *Id.* ¶ 28.

[16] *Id.* ¶¶ 25, 27-28.

**B.      The Company's 10b5-1 Plan**

"Following the sale of a division in early 2011, the Company was left with a cash position of approximately $238 million" and "faced demands to return some of that cash to its stockholders."[17]  The Company chose to authorize repurchases of the Company's common stock.[18]

At various times, the Company entered into agreements with Merrill Lynch, Pierce, Fenner & Smith Incorporated, including one dated November 15, 2012,[19] as part of a 10b5-1 repurchase plan  (the "10b5-1 Plan").[20]  Between November 15, 2012 and May 9, 2013, Merrill Lynch was authorized under the 10b5-1 Plan to purchase shares of Company stock on the open market on behalf of the Company if the price fell below $9.00 per share, but the Company's stock did not fall below $9.00 per share during this period.[21]

---

[17] Report at 17 (Compl. Ex. A).

[18] *Id.* at 18.

[19] *Id.*; Compl. ¶ 34, Ex. B (Stock Purchase Plan Agreement dated November 15, 2012).

[20] Rule 10b5-1 of the Securities Exchange Act of 1934 "permits insiders to implement written, pre-arranged stock trading plans when they are not in possession of material non-public information.  Generally speaking, 10b5-1 plans offer a safe harbor for corporate insiders to sell stock by ceding trading authority to third parties with exclusive discretion to execute trades under certain pre-determined parameters." *Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. June 14, 2016) (internal quotation marks omitted), *aff'd*, 155 A.3d 1283 (Del. 2017).

[21] Compl. ¶ 35.

Effective as of May 13, 2013, Richardson amended the 10b5-1 Plan to direct Merrill Lynch to purchase stock if the market price fell below $12.00 per share.[22] According to the Report, the Board had given Richardson the ability to unilaterally adjust the price under the 10b5-1 Plan "within a given range," although the Company did not produce any documents in response to Busch's First Section 220 Request demonstrating that Richardson had been given this authority.[23]

## C. The May 2013 Transactions

On May 16, 2013, the Company repurchased 200,000 shares of stock from Richardson and 48,925 shares from the Wildlife Foundation for approximately $2.34 million and $572,422, respectively, or approximately $2.9 million in total.[24] Both of these transactions "were accomplished outside the 10b5 stock repurchase plans and without a third-party broker."[25] More specifically, both of these transactions were "privately negotiated" and priced at $11.70 per share, "the previous day's closing price for the Company's shares."[26]

With respect to the repurchase of Richardson's shares, the Report states that Richardson expressed to the Company his interest in selling 200,000 shares and that

---

[22] *Id.* ¶ 37.

[23] *Id.* ¶ 36 (citing Report at 18).

[24] *Id.* ¶¶ 32, 41, 54; Report at 20; Compl. Ex. I at 2.

[25] Report at 29 (quoted in part in Compl. ¶ 53).

[26] Report at 20; *see also* Compl. Ex. I at 2.

8

the Company offered him $11.70 per share, which price was set by the members of the Compensation and Governance Committee.[27] No documents produced in response to Busch's First Section 220 Request, however, reflect that the Board or the Compensation and Governance Committee approved this transaction.[28] Nor did Richardson execute a written certification that he was not in possession of "inside information" before the transaction occurred, as allegedly was required under the Company's Insider Trading Policy.[29]

With respect to the repurchase of the Wildlife Foundation's shares,[30] the Report states that Richardson had no involvement in the decision to sell those shares, that the repurchase was negotiated and approved by Terry Moyer, the Vice President and Manager of the Wildlife Foundation, and that the transaction was determined to be fair by the Compensation and Governance Committee.[31] The Report also notes that it was a historical practice for Richardson to gift shares to the Wildlife Foundation each year, which the Wildlife Foundation would sell to cover its

---

[27] Compl. ¶ 54; Report at 20.

[28] Compl. ¶¶ 56-57.

[29] *Id.* ¶¶ 44, 58 (quoting the policy as requiring Richardson to comply with certain procedures "including (i) notifying, and obtaining the approval of, the Company's General Counsel and (ii) executing a written certification that [he] did not have any material nonpublic information"). The Complaint alleges that the approval of the Company's General Counsel was not obtained but acknowledges that the Company did not have a General Counsel at the time. *Id.* ¶¶ 59-60.

[30] *Id.* ¶ 62.

[31] *Id.* ¶ 63 (citing Report at 20); Report at 21.

expenses.[32] Busch alleges that the Report's conclusion that Richardson was not involved in the May 2013 repurchase of the Wildlife Foundation's shares lacks credibility, given that it occurred on the same day and at the exact same price that Richardson sold some of his own shares.[33] Once again, no documents were produced in response to Busch's First Section 220 Request reflecting Board approval of this transaction.[34]

### D. The October 2014 Transaction

On October 16, 2014, the Company repurchased 50,000 shares of stock from the Wildlife Foundation for approximately $495,000, at a price of $9.91 per share, which was three cents less than the previous day's closing price of $9.94 per share.[35] The Report states that Richardson did not negotiate the timing or the price of the transaction, but that "he was generally aware of it."[36] The Report further states that Plante, the Chairman of the Compensation and Governance Committee, "spoke with the Company's outside counsel before the transaction was completed, and the Company received legal advice regarding the transaction."[37]

---

[32] Report at 20.

[33] Compl. ¶ 64.

[34] *Id.* ¶ 65.

[35] *Id.* ¶ 68; Report at 22; Compl. Ex. I at 2.

[36] Compl. ¶ 69 (quoting Report at 22).

[37] *Id.* ¶ 83 (quoting Report at 22).

As was the case with the May 2013 transactions, no materials were produced to Busch in response to his First Section 220 Request reflecting Board or any Board committee review or approval of the repurchase of shares from the Wildlife Foundation in October 2014.[38]  Nor did Richardson provide a written certification under the Company's Insider Trading Policy in connection with this transaction, as allegedly was required.[39]

## E.    Public Disclosure of the Transactions

The May 2013 and October 2014 transactions (collectively, as defined above, the "Transactions") were not disclosed as related-party transactions in the Company's public filings until August 2015—more than two years after the May 2013 transactions and about ten months after the October 2014 transaction.[40] According to the Report, the Company's auditor at the time, Ernst & Young, "had previously determined that the Company should not disclose the repurchases as related-party transactions based on" Form 4 filings that Richardson had made on May 16, 2013 and August 18, 2014.[41]   Those filings reflected changes in

---

[38] *Id.* ¶ 73.

[39] *Id.* ¶¶ 72, 74.

[40] *Id.* ¶¶ 61, 86.

[41] Report at 21-22.

Richardson's share ownership but did not reflect that the transactions were related-party transactions.[42]

In 2015, the Company switched auditors from Ernst & Young to BDO USA, LLP. According to the Report, "BDO, relying on the same financial records that [Ernst & Young] had, concluded that the May 2013 Repurchases [and] October 2014 Repurchase should be disclosed as related-party transactions" and, in fact, "suggested that the Company go back and restate prior statements, but E&Y refused."[43] Based on BDO's recommendation, the Board decided to disclose the Transactions as related-party transactions in a proxy statement the Company issued in August 2015, as follows:

> On October 16, 2014, the Company purchased 50,000 Class B shares from Richardson Wildlife Foundation, an Illinois not-for-profit corporation, at a negotiated price of $9.91 per share. Edward Richardson, Chairman and CEO of the Company, also serves as President of the Richardson Wildlife Foundation. These shares were repurchased pursuant to the Company's share repurchase authorization approved by its Board of Directors. Mr. Richardson filed a Form 4 to record the gifting of his Class B shares.
>
> On August 9, 2013, the Board authorized the repurchase of 300,000 Class B shares from Mr. Richardson at a negotiated price of $11.50 per share.[44] On May 15, 2013, the Company repurchased 48,925 Class B shares from the Richardson Wildlife Foundation and an additional 200,000 Class B shares from Mr. Richardson at a negotiated price of

---

[42] *Id.* ¶¶ 61 n.18, 86 n.32.

[43] *Id.* at 22-23.

[44] Busch does not challenge this August 2013 transaction, which was effectuated "at a price $0.50 [per share] below the current bid price." *Id.* at 21.

12

$11.70 per share. These shares were repurchased pursuant to the Company's share repurchase authorization approved by its Board of Directors. Mr. Richardson filed a Form 4 to record the gifting of his Class B shares.[45]

## F.    Busch's First Section 220 Request

On October 13, 2015, Busch sent his First Section 220 Request to the Company seeking to inspect books and records related to the Transactions.[46] As noted above, the Company did not produce any documents in response to this request showing that the Board or any committee of the Board had reviewed or approved any of the Transactions.[47]

On March 21, 2016 and again on June 13, 2016, Busch's counsel sent letters to the Company's counsel requesting that "the Company either produce documentary evidence demonstrating that the Board reviewed and approved the related party transaction[s], or state affirmatively that such review and approval did not occur."[48] On March 31, 2016 and June 20, 2016, respectively, the Company's counsel responded, stating each time that "[w]ith regard to the May 15, 2013 and October 16, 2014 transactions, both were pursuant to a later stock repurchase plan approved by the Board of Directors on terms that were generally available to the

---

[45] *Id.* at 23.

[46] Compl. ¶ 87.

[47] *Id.* ¶ 88.

[48] *Id.* ¶ 89 (citing Ex. E at 2; Ex. G at 2).

13

Company's stockholders, and which was administered by a third-party broker."[49] Separately, on an April 7, 2016 conference call with investors, Richardson stated that any repurchase of stock from him "was done in the open market . . . by BofA who is our agent and was regulated within the shares being sold that day."[50]

Busch alleges that by comparing the documents produced in response to his First Section 220 Request to "the statements of Richardson and the Company's counsel, and the fact that the Company had failed to disclose the transactions as required," he "concluded that the members of the Board (other than Richardson himself) had not known that the transactions had taken place."[51]

## G. The Demand and the Special Committee Investigation

On August 10, 2016, Busch made his Demand in which he requested that the Transactions be unwound and, if necessary, that the Company commence legal proceedings to rescind them.[52] In response to the Demand, the Board formed the Special Committee, which consisted of three directors: Plante (the Chairman), Benham, and Halverson.[53] The Board delegated to the Special Committee the "authority to investigate with the assistance of counsel the matters set forth in the

---

[49] *Id.* ¶ 90 (citing Ex. F at 2; Ex. H at 2).

[50] *Id.* ¶ 51.

[51] *Id.* ¶¶ 90-91.

[52] *Id.* ¶¶ 11, 92; *see also id.* Ex. I.

[53] *Id.* ¶ 93.

Demand and to provide its conclusions and recommendations to the Board."[54] "The Board retained full authority to act on the matters addressed in the Demand, subject to its consideration of the conclusions and recommendations of the Committee."[55]

The Special Committee retained Richards, Layton & Finger, P.A. as its counsel to investigate the Demand. Richards Layton collected and reviewed documents, interviewed six individuals, met with the Special Committee, and drafted the Report that the Special Committee issued on March 9, 2017.[56]

On May 9, 2017, the Board responded to Busch's Demand, informing him that it was "declining to take any action including a refusal to rescind" the Transactions.[57] On May 17, 2017, Busch sent his Second Section 220 Request, in response to which the Company produced a copy of the Report to him.[58]

According to the Complaint, the Report revealed that:

- Richardson's claim that the May 2013 Transactions and October 2014 Transaction had been made pursuant to the 10b5-1 Plan was false; to the contrary, the transactions had been privately negotiated in an *ad hoc* manner;

- The Company had no meeting minutes, resolutions, or for that matter any written documentation at all regarding the May 2013 Transactions and October 2014 Transaction;

---

[54] Report at 2-3.

[55] *Id.* at 3.

[56] *Id.* at 5-8.

[57] Compl. ¶ 94.

[58] *Id.*

15

- The May 2013 Transactions and October 2014 Transaction were not allowed by the Company's Insider Trading Policy, but Richardson had made them anyway;

- The May 2013 Transactions and October 2014 Transaction had purportedly been approved by the Company's Board and Compensation and Corporate Governance Committee, although no records were kept demonstrating any review or approval.[59]

The Report contains a section titled "Concerns Regarding Disclosures To Stockholders," which includes a recommendation "that the Board, in conjunction with its securities counsel, consider what actions, if any, would be appropriate" as a result of the various disclosure issues.[60] In that section, the Report refers, albeit in a qualified way, to the inaccuracy of the representation Company counsel made to Busch before he made the Demand:

> [I]n a June 20, 2016 letter to the Stockholder's counsel, the Company's counsel stated that, regarding the May 2013 Repurchases and the October 2014 Repurchase, "both were pursuant to a larger stock repurchase plan approved by the Board of Directors on terms that were generally available to the Company's stockholders, and which were administered by a third party broker." Based on the Committee's investigation, which confirmed that the May 2013 Repurchases and the October 2014 Repurchase were accomplished outside the 10b5 stock repurchase plans and without a third-party broker, *this statement appears to be inaccurate*.[61]

---

[59] *Id.* ¶ 95 (footnote omitted).

[60] Report at 28-30.

[61] *Id.* at 29 (emphasis added).

16

The Special Committee decided in the Report "not to recommend that the Company pursue litigation in response to the Demand" and unanimously recommended "that the Board reject the Demand."[62]  In support of this conclusion, the Report commented that "it is unclear that the Company was harmed as a result" of the Transactions, noted the Board's reliance on advice from Ernst & Young and its legal advisors (Bryan Cave) in connection with the Transactions, and considered other potential litigation defenses, including "an exculpatory provision in the Company's Charter."[63]

The Report also considered the costs of bringing a lawsuit, taking into account the Company's obligations to indemnify any officer or director defendant, and concluded that "the potential costs of bringing any lawsuit outweigh the potential benefits of such a lawsuit."[64]  In performing this cost-benefit analysis, the Report intimated that the Special Committee estimated any potential recovery to be worth less than $150,000 based on the fact that Busch did not object to a repurchase of shares from Richardson in August 2013 that was effectuated at a $0.50 per share discount to the market price.[65]

---

[62] *Id.* at 24, 28.

[63] *Id.* at 24-26.

[64] *Id.* at 26-27.

[65] *See id.* at 25 (explaining that "[e]ven if the Company had obtained the same $0.50 per-share discount as was achieved" when repurchasing shares from Richardson in August

17

## H.    Procedural History

On December 5, 2017, Busch filed the Complaint asserting a single derivative claim for breach of fiduciary duty against the five current members of the Board for, among other things, failing to take action to recover damages as a result of the Transactions.[66]  On March 9, 2018, defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1 or, alternatively, Rule 12(b)(6).

## II.    ANALYSIS

Court of Chancery Rule 23.1 requires a stockholder who wishes to bring a derivative claim on behalf of a corporation to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[67]  The rule embodies a "basic principle of the Delaware General Corporation Law . . . that directors, and not the stockholders, manage the business and affairs of the corporation" and that the "decision to bring or to refrain from bringing suit on behalf of the corporation is the responsibility of the board of directors."[68]  The rule "is designed to give a corporation, on whose

---

2013, "the Company would have paid only $147,962.50 less in total in the May 2013 Repurchases and the October 2014 Repurchase.").

[66] Compl. ¶¶ 174-78.

[67] Del. Ct. Ch. R. 23.1.

[68] *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009) (citing 8 *Del. Ch.* § 141(a) and *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990)).

18

behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[69]

Where a plaintiff chooses not to make a demand on the board, the court asks whether the "threshold presumptions of director independence and disinterestedness are rebutted by well-pleaded, particularized facts and whether the complaint presents particularized facts that otherwise create a reasonable doubt that the challenged conduct was a valid exercise of business judgment."[70] Where, by contrast, a stockholder elects to make a demand on the corporation to take action, the stockholder "tacitly concedes the independence of a majority of the board to respond."[71] In that situation, as our Supreme Court held in *Spiegel v. Buntrock*,[72] if the board refuses the stockholder's demand, "the only issues to be examined are the good faith and reasonableness of its investigation."[73]

In this case, where Busch decided to make the Demand and asked the Board to unwind the Transactions and pursue litigation if necessary, he advances

---

[69] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

[70] *FLI Deep Marine LLC*, 2009 WL 1204363, at *3.

[71] *Spiegel*, 571 A.2d at 777; *see also Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991) (by making demand on a board before filing suit, a stockholder plaintiff "tacitly concedes lack of self-interest and independence of a majority of the Board"), *overruled on other grounds* by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[72] 571 A.2d 767 (Del. 1990).

[73] *Id.* at 777.

essentially two lines of argument in opposition to defendants' motions to dismiss under Rule 23.1. First, Busch argues that the court should not apply the *Spiegel* framework and he should not be deemed to have conceded the independence of a majority of the Board by making his Demand on the theory that he was "actively misled" by the Company into believing that "the Board played no role" in approving the Transactions.[74] Busch asserts that the court instead should apply the two-part test our Supreme Court established in *Zapata v. Maldonado* for deciding a special litigation committee's motion to dismiss a derivative action where making a demand was excusable. Second, Busch contends that there are several reasons why this action may not be dismissed under the *Spiegel* demand refusal framework.

The court analyzes these arguments in reverse order. Because defendants' Rule 23.1 arguments are dispositive, the court does not address their Rule 12(b)(6) arguments, which fall into three categories: (1) laches, (2) lack of standing for the May 2013 transactions because Busch did not acquire his shares until June 2014, and (3) application of the exculpatory provision in the Company's certificate of incorporation.

---

[74] Pl.'s Opp'n Br. 3-4.

**A. The Complaint Is Subject to Dismissal Under the *Spiegel* Demand Refusal Framework**

In applying the *Spiegel* framework, this court has explained that because a stockholder plaintiff who makes a demand "concedes that the board had the requisite independence and disinterest to evaluate the demand objectively," the "decision to refuse a plaintiff's demand is afforded the protection of the business judgment rule unless the plaintiff alleges particularized facts that raise a reasonable doubt as to whether the board's decision to refuse the demand was the product of valid business judgment."[75] Accordingly, in order to successfully challenge the Board's decision to refuse the Demand in this case, Busch "must allege particularized facts that raise a reasonable doubt that (1) the board's decision to deny the demand was consistent with its duty of care to act on an informed basis, that is, was not grossly negligent; or (2) the board acted in good faith, consistent with its duty of loyalty."[76] Busch has done neither in my view.

A board acts with gross negligence by failing to "properly inform itself of material information reasonably available to it before refusing the demand."[77] To show bad faith, Busch must plead with particularity that the Board "intentionally

---

[75] *Friedman v. Maffei*, 2016 WL 1555331, at *8 (Del. Ch. Apr. 13, 2016).

[76] *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015) (internal citations omitted).

[77] *Andersen v. Mattel, Inc.*, 2017 WL 218913, *4 (Del. Ch. Jan. 19, 2017).

21

act[ed] in disregard of the Company's best interest in deciding not to pursue the litigation the Plaintiff demanded."[78] "Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part."[79] When directors decide to reject a demand, this court "takes into account not only the defendants' countervailing legal arguments, but also the other relevant factors considered by the board—*e.g.*, whether the costs of pursing the claims outweigh the expected recovery."[80]

Busch puts forward four reasons why he believes the Special Committee's investigation was flawed, although he does not explain whether any particular one or some combination of them is supposed to show that the Special Committee was grossly negligent, acted in bad faith, or both. As discussed below, none of the reasons Busch has identified is supported by particularized facts sufficient to create a reasonable doubt about the Special Committee's good faith or due care.

First, Busch argues "there is no evidence that the [Special Committee] sought any information regarding the pertinent Delaware law regarding related party transactions."[81] This contention, which ostensibly is directed to the Special Committee's diligence, does not identify any particularized facts indicative of gross

---

[78] *Friedman*, 2016 WL 1555331, at *12 (quoting *Ironworkers*, 2015 WL 2270673, at *27).
[79] *Andersen*, 2017 WL 218913, at *5 (quoting *Ironworkers*, 2015 WL 2270673, at *27).
[80] *Friedman*, 2016 WL 1555331, at *12.
[81] Pl.'s Opp'n. Br. 22-23.

negligence but instead relies on an alleged lack of evidence. The alleged lack of evidence, however, is belied by several important facts, namely that: (1) the Special Committee was represented by a prominent Delaware corporate law firm, (2) the Report expressly states that the Special Committee "considered the fiduciary duties owed by directors and officers of a Delaware corporation and the legal standards that would apply in any action brought by the Company against them," and (3) the Report contains a ten-page discussion of the legal framework for its investigation, including a two-page summary of the duty of loyalty under Delaware law and other sections describing disclosure obligations relevant to related-party transactions under both Delaware and federal law.[82] Given these facts of record, and Busch's lack of any particularized factual allegation actually suggestive of gross negligence, the Complaint fails to raise a reasonable doubt concerning the Special Committee's due care in rejecting the Demand.

Second, Busch suggests there is "no indication that the [Special Committee] sought tolling agreements" despite Busch's repeated requests that it do so.[83] This argument challenges a *conclusion* of the Special Committee concerning a matter that

---

[82] Report at 8-12, 16-17, 24-25.

[83] Pl.'s Opp'n. Br. 23.

23

was considered during its investigation.[84] Busch may strongly disagree with the decision the Special Committee made not to seek tolling agreements, but such a disagreement does not equate to particularized facts creating a reasonable doubt about what is relevant here: the good faith and level of care of the Special Committee in deciding to refuse the Demand based on its investigation.[85] As this court has held, in the demand refusal context, "the pertinent 'reason to doubt' is *not* doubt about the propriety of the underlying conduct, nor is it doubt about whether the Board, in rejecting the demand, made a wise decision; it is doubt whether the Board's action, wise or foolish, *was taken in good faith and absent gross negligence*."[86] The same is true about the subsidiary decision of the Special Committee not to seek tolling agreements as it is for the ultimate decision to refuse the Demand.

Third, Busch asserts that instead of investigating "Richardson's unilateral amendment to the 10b5-1 Plan in May 2013," the members of the Special Committee "simply assured themselves that they had given latitude to Richardson to adjust the

---

[84] *See* Special Committee Defs.' Opening Br., Ex. 3 at 2 (minutes of Special Committee meeting reflecting discussion of the request of stockholder's counsel "that the Committee securing tolling agreements with the individuals implicated in the wrongdoing.").

[85] *See Ironworkers*, 2015 WL 2270673, at *32 ("[A] disagreement, however vehement, with the *conclusion* of an independent and adequately represented committee is not the same as pleading particularized facts that create a reasonable doubt that the Board acted in what it perceived as the best interests of the corporation.").

[86] *Id.* at *26.

24

repurchase price."[87] This grievance fails for two reasons. First, as discussed above, all of the challenged Transactions were privately negotiated and were not made under the 10b5-1 Plan.[88] Thus, Richardson's decision to amend the price feature of the 10b5-1 Plan is irrelevant to the claims under investigation concerning the Transactions as they were effectuated. Second, the Special Committee did consider the amendment to the 10b5-1 Plan, as evidenced by the acknowledged fact that it made a finding on the issue, *i.e.*, that "the Board gave Richardson latitude to adjust the target price within a given range."[89] Given that the Special Committee did in fact look into the amendment to the 10b5-1 Plan and that the amendment was not directly relevant to the Transactions complained about in the Demand, Busch's grievance concerning this matter fails to provide a reasonable basis to doubt the good faith or level of care of the Special Committee.[90]

---

[87] Pl.'s Opp'n. Br. 23-24.

[88] *See* Section I.C-D.

[89] Report at 18; *see also id.* at 6 (reflecting that the Special Committee received documents and interviewed witnesses concerning the stock repurchase plans and "the amendments thereto").

[90] *See Belendiuk v. Carrion*, 2014 WL 3589500, at *5 (Del. Ch. July 22, 2014) (the board decides "the best method to inform itself of the facts relating to the alleged wrongdoing and the consideration, both legal and factual, bearing on a response to the demand") (internal quotation marks omitted); *Mt. Moriah Cemetery ex. rel. Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991) ("Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue. That decision will not be second guessed by this Court on the showing made here."), *aff'd*, 599 A.2d 413 (Del. 1991) (TABLE).

Finally, Busch asserts that the Special Committee "purported to improperly rely on EY and Bryan Cave," the Company's former auditor and outside counsel.[91] As stated, the factual premise of this criticism is plainly incorrect. The Report states that "the Board relied on the advice of its auditor, E&Y, which did not believe that additional disclosure [of the Transactions] was necessary beyond the Form 4 filings already completed" and that, at least for the October 2014 transaction, "the Company's outside counsel was contacted before the repurchase" and provided "legal advice regarding the transaction."[92] In other words, the Report discusses advice that directors of the Company received from Ernst & Young and Bryan Cave at the time of the Transactions but it provides no indication that *the Special Committee itself* ever sought or relied on any such advice.

Although not phrased as such, Busch's criticism presumably was intended to question the Special Committee's consideration of "the directors' reliance on advice from the Company's officers, auditors, and outside counsel" *as a defense* to any potential claims that may be asserted against them.[93] But it is hardly an indication of bad faith or gross negligence for a special committee to take into consideration defenses that may be asserted by a target of a claim when weighing the costs and

---

[91] Pl.'s Opp'n. Br. 24.

[92] Report at 22, 24, 25.

[93] *Id*. at 27-28.

benefits of pursuing such claim. Just the opposite. Had the Special Committee not considered these factors, it legitimately would have been open to criticism. And importantly, no particularized facts have been pled suggesting that the Special Committee was grossly negligent or acted in bad faith by simply considering the directors' reliance on advisors as a potential defense.

The Complaint asserts "it is implausible" that Ernst & Young advised the Company not to disclose the Transactions as related-party transactions, but this assertion is conclusory and speculative.[94] As for Bryan Cave, the Complaint goes on at length explaining the relationship between Richardson and a Bryan Cave attorney (Scott Hodes) who served as a director of the Company for a period of time, but provides no particularized facts suggesting that it would have been unreasonable for the Board to rely on whatever advice Bryan Cave provided—the substance of which is not disclosed in the Report—in connection with the Company's repurchase of shares from the Wildlife Foundation in October 2014.[95] Given that the Complaint fails to plead with particularity any facts suggesting that the directors' assertion of a defense based on advice received from Ernst & Young or Bryan Cave would be frivolous,[96] it certainly cannot be the case that the Special Committee acted in bad

---

[94] Compl. ¶ 119.

[95] *Id.* ¶¶ 121-154.

[96] Even if the directors received incorrect or bad advice, it does not necessarily follow that their reliance on that advice was unreasonable. *See Cirillo Family Tr. v. Moezinia*, 2018

27

faith or was grossly negligent for simply considering the implications of such a potential litigation defense among the many other factors it took into account in its investigation.

\* \* \* \* \*

For the reasons explained above, Busch has failed to allege any particularized facts raising a reasonable doubt concerning the Special Committee's good faith and due care. Thus, under the *Spiegel* demand refusal framework, dismissal of the Complaint necessarily would follow. I turn next to consider whether the same outcome would be compelled if, as Busch contends, he should not be deemed to have conceded that a majority of the Board was disinterested and independent.

**B.      The Complaint Must Be Dismissed Even if the *Spiegel* Demand Refusal Framework Does Not Apply**

Busch argues that it would be unfair for the court to impute to him a concession that a majority of the Board was disinterested and independent based on his contention that the Company misled him into believing—*before* he made the Demand—that the Board played no role in the Transactions, which caused him to make his Demand rather than to argue demand futility. Busch points to two sources of misinformation by the Company. The first source comes from two letters the

---

WL 3388398, at *1 (Del. Ch. July 11, 2018) (granting a motion for summary judgment because the directors "reasonably relied, in good faith, on the advice of outside legal counsel with respect to the preparation of the notice even though, unbeknownst to the directors, that advice was seriously flawed").

28

Company's outside counsel sent to Busch's counsel on March 31, 2016 and June 20, 2016, stating that the Transactions were made pursuant to a "stock repurchase plan approved by the Board of Directors on terms that were generally available to the Company's stockholders, and which was administered by a third-party broker."[97] The second source is Richardson's statement during an investor call in April 2016 that any stock repurchased from him was "done in the open market . . . by BoA."[98] Busch "suggests that the Court adopt a *Zapata*-type review" of the Special Committee's independence "as a consequence of [these] affirmative misrepresentations."[99]

Defendants dispute Busch's contention that he was misled into believing that the Transactions were made without the Board's involvement. They emphasize that the letters from the Company's outside counsel make no express representation to that effect. They also dispute that Busch could have been misled into believing that the repurchases were made on the open market under a repurchase plan based on the text of the Demand, which was made on August 10, 2016, many weeks after the letters from the Company's outside counsel were sent. In particular, defendants point to the following statements in the Demand that appear under headings stating

---

[97] Compl. ¶ 90 (citing Ex. F at 2; Ex. H at 2).

[98] *Id.* ¶ 51.

[99] Pl.'s Opp'n Br. 19.

that "THE COMPANY'S SHARE REPURCHASES . . . DID NOT TAKE PLACE ON THE OPEN MARKET:"

> Richardson himself has represented that these purchases were made on the open market. *See Earnings Call Transcript, April 7, 2016,* ("any stock that was purchased anywhere was done in the open market was done by BofA who is our agent and was regulated within the shares being done that day.") According to YahooFinance, only 11,900 shares were traded on May 15, 2013, meaning that contrary to Richardson's representation, these shares were not traded on the open market.

* * * * *

> According to YahooFinance, only 31,400 shares were traded on October 16, 2014, meaning that contrary to Richardson's representations, these shares were not traded on the open market.[100]

Defendants surmise that Busch inferred from the Company's production in response to his First Section 220 Request, in particular from the lack of documents reflecting Board involvement, that the Board must have played no role in the Transactions. On the law, defendants emphasize that this court has applied the *Spiegel* test strictly when a litigation demand has been made, and argue further that, even if the court allowed Busch to withdraw his concession of independence, the appropriate analysis would be to apply the test for determining demand futility.

Defendants are correct that this court has applied the *Spiegel* implied concession of board independence and disinterestedness strictly when a stockholder

---

[100] Comp. Ex. I at 2-3 (footnote omitted).

30

plaintiff has made a litigation demand. In *FLI Deep Marine LLC v. McKim*, for example, the court declined to "part ways with established Delaware law" and refused to grant plaintiffs relief from such a concession even though the complaint they later filed "might well" have pled sufficient facts to demonstrate that the board lacked independence.[101] In doing so, the court noted that the plaintiffs were aware of the facts potentially calling into question the board's independence before they made their demand.[102]

The situation here, however, is very different. It would be inequitable in my view to hold Busch to the concession of independence and disinterestedness attendant to his making the Demand if it were true that the Company misled him— intentionally or not—into making the Demand where he otherwise would not have done so. The difficult question is determining as a factual matter whether or not that occurred in this case.

It is clear to the court that the letters from the Company's outside counsel were inaccurate, which the Report itself seems to acknowledge, albeit begrudgingly.[103] Contrary to those letters, the Transactions were not effectuated pursuant to a stock repurchase plan. The letters also could be read to imply that a third-party broker

---

[101] 2009 WL 1204363, at *3.

[102] *Id.*

[103] *See* Report at 29 (noting that the statement in outside counsel's March 31, 2016 and June 20, 2016 letters "appears to be inaccurate").

executed the Transactions without direct Board involvement, particularly given that they were written in response to Busch's request that the Company "either produce documentary evidence demonstrating that the Board reviewed and approved the related party transaction[s]"—which the Company did not do—"or state affirmatively that such review and approval did not occur."[104] What is unclear is whether Busch actually relied on and was misled by the representations in these letters in deciding to make the Demand.

Given that the Demand repeatedly states that the Transactions were not made on the open market, Busch cannot be heard to complain that he was misled into believing otherwise by the letters from outside counsel or Richardson's statement during the investor call. Even so, it is quite possible that the letters and Richardson's comments misled Busch into believing that the Board was not involved in the Transactions by suggesting that a third-party broker handled the Transactions, which could be accomplished privately without Board involvement. It is not necessary to consider this issue further, however, because the outcome of the pending motion would be the same even if the court disregarded the fact that Busch made the Demand and did not deem him to have conceded the independence of the Board. I

---

[104] Compl. ¶ 89 (citing Ex. E at 2; Ex. G at 2).

turn to that analysis next, starting with a brief explanation of why the *Zapata* test

would not apply here.

In *Zapata*, the question before the Delaware Supreme Court was: "When, if

at all, should an authorized board committee be permitted to cause litigation,

*properly initiated by a derivative stockholder in his own right*, to be dismissed?"[105]

In other words, *Zapata* deals with a situation where "a derivative suit is brought,

demand is excused,[106] and *then* the company attempts to cleanse conflicts by

creating a special litigation committee to determine the course of the litigation."[107]

It is in this context that our Supreme Court created a unique two-part test that

recognizes the need for more judicial supervision.[108] The test instructs that the trial

court (1) "should inquire into the independence and good faith of the committee and

the bases supporting its conclusions" and (2) "should determine, applying its own

business judgment, whether the motion should be granted."[109] As explained in

---

[105] *Zapata*, 430 A.2d at 785 (emphasis added).

[106] This situation could arise in either of two circumstances: (1) where an adjudication is made that demand is excused or (2) where no motion to dismiss is filed under Rule 23.1 in the face of well-pled allegations that a majority of the board is conflicted.

[107] *Ironworkers*, 2015 WL 2270673, at *27.

[108] *Zapata*, 430 A.2d at 785, 787-89; *see also* Collins J. Seitz and S. Michael Sirkin, *The Demand Review Committee: How it Works, and How it Could Work Better*, 73 Bus. Law. 305, 312-14 (2018) ("The skepticism about the potential structural bias in the special litigation committee context also recommends a higher standard of judicial review than the business judgment rule deference that is given to a demand review committee process and recommendation.").

[109] *Zapata*, 430 A.2d at 788-89.

*Zapata*, the rationale for these two steps was to "find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation."[110]

Busch has cited no authority, and the court is aware of none, where the *Zapata* test has been applied outside of a case where making a demand would be excused. Indeed, the Supreme Court in *Spiegel* endorsed a Court of Chancery decision finding that this is the *only* circumstance in which the *Zapata* test would apply:

> In *Abbey*, the Court of Chancery properly concluded that the special review procedure which this Court set up in *Zapata* applies:
>
> > *only* in a situation where, because of some alleged self-interest, the board of directors is disqualified from acting itself. Otherwise, but for the disqualifying self-interest factor, the board could make its decision for itself, whether it chose to do so through a committee or not, and cause an appropriate motion to be made on behalf of the corporation just as in any normal suit in which the corporation was named as a party defendant.[111]

Given that the *Zapata* test was designed to address dismissal motions where a board is conflicted and thus a demand would be excused, and given the absence of any authority applying the test outside of that context, the court rejects Busch's

---

[110] *Id.* at 787.

[111] *Spiegel*, 571 A.2d at 777 (quoting *Abbey v. Comput. Comm. Tech. Corp.*, 457 A.2d 368, 373 (Del. Ch. 1983)) (emphasis added).

request to apply the *Zapata* test here. This leaves the question: What standard should apply if the court were to allow Busch to, in effect, withdraw the concession of Board independence and disinterestedness he made by making his Demand? Logically, the test that should apply in that situation is one that treats Busch as if he filed the Complaint without ever having made the Demand, which, as defendants suggest, would be the test for determining demand futility.

Under Delaware law, depending on the factual scenario, there are two different tests for determining whether demand may be excused: the *Aronson* test and the *Rales* test.[112] The test articulated in *Aronson v. Lewis*[113] generally applies when "a *decision* of the board of directors is being challenged in the derivative suit."[114] On the other hand, one of the circumstances in which the test set forth in *Rales v. Blasband*[115] would govern is when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[116]

---

[112] Both tests boil down to the same inquiry: whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

[113] 473 A.2d 805.

[114] *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[115] *Id.*

[116] *Id.* at 933-34 & n.9. *Rales* also applies "where a business decision was made by the board of a company, but a majority of the directors making the decision have been

35

Although the Complaint is not a model of clarity, the conduct it challenges appears to focus on the Board's conduct when it rejected Busch's Demand, shortly after the Special Committee completed its investigation. This is because the Complaint asserts a single claim for breach of fiduciary duty against the five directors who were on the Board when the Demand was rejected for failing "to properly disclose [the Transactions] to stockholders or take action to recover damages as a result of Richardson's breaches of fiduciary duty" after determining "that the May 2013 Transactions and October 2014 Transaction were the result of a flawed process."[117] Because the Complaint challenges the failure of the Board to take certain actions, as opposed to any affirmative decision it made, the *Rales* test applies here.[118]

---

replaced" and where "the decision being challenged was made by the board of a different corporation." *Id.* at 934.

[117] Compl. ¶ 176.

[118] During argument, counsel for both parties seemed to agree that, if a demand futility test were to be applied here, it would be the *Aronson* test. *See* Tr. 29, 87 (Sept. 21, 2018) (Dkt. 31). The Complaint, however, does not assert claims against members of the Board for *approving* the Transactions, either in May 2013 or October 2014, but instead focuses on the subsequent failure of the Board to take action "after determining that the [Transactions] were the result of a flawed process." Compl. ¶ 176. Had it been Busch's intention to sue the directors who approved the Transactions, he presumably would have named them all as defendants but he did not do so. *See* Richardson Electronics, Form 10-K (filed June 1, 2013), at *66 (listing the six directors on the Board as of June 2013, four of whom are not named as defendants). Regardless, the outcome here would be the same in my view under the *Aronson* test because the same underlying issues are considered under that test as under the *Rales* test. *See Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (Strine, V.C.) ("Upon closer examination, however, that singular inquiry [of *Rales*] makes germane all of the concerns relevant to the first and second prong of *Aronson*.").

Under *Rales*, Busch's breach of fiduciary duty claim would be dismissed under Rule 23.1 unless particularized allegations of the Complaint "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[119]  When the Board rejected Busch's Demand, it had five members:  Richardson, Plante, Belin, Benham, and Halverson.[120]  Thus, for the Complaint to survive a Rule 23.1 dismissal motion under *Rales*, it would need to "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand."[121]

The only director on the Board who personally received a financial benefit from any of the Transactions is Richardson.  Indeed, Busch concedes that the other four directors on the Board were disinterested and independent in all respects other than having an alleged substantial risk of liability.[122]  In other words, Busch concedes that none of these four directors received a financial benefit from any of the Transactions and none of them is beholden to Richardson.  Thus, the sole inquiry the court must undertake to determine whether at least half of the Board was independent and disinterested when this action was filed is whether at least two of the four

---

[119] *Rales*, 634 A.2d at 934.

[120] *See* Compl. ¶¶ 24-28.

[121] *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007).

[122] Tr. at 88-89.

37

directors other than Richardson would have a substantial risk of liability with respect to the challenged Transactions. Consistent with this court's precedents examining demand futility on a claim-by-claim basis, the court considers this question separately for the May 2013 and the October 2014 Transactions.[123]

At the time of the May 2013 transactions, three of the defendants (Benin, Benham, and Halverson) were not directors of the Company. They joined the Board about five months later, in October 2013.[124] As such, these three directors and thus a majority of the Board would not have a substantial risk of liability with respect to the *approval* of the May 2013 transactions.[125]

Shifting the focus of the inquiry, Busch argues that these three directors nevertheless would have a substantial risk of liability on the theory that they somehow "ratified" the May 2013 transactions by rejecting the Demand notwithstanding what was learned during the Special Committee's investigation.[126] This argument, which Busch concedes is without precedent,[127] fails in my view. As

---

[123] *See Teamsters Union 25 Health Servs. & Insur. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015) ("[U]nder Delaware law, the demand futility analysis is conducted on a claim-by-claim basis.") (citations and internal quotation marks omitted).

[124] Compl. ¶¶ 26-28.

[125] *See Baiera*, 119 A.3d at 63 (analyzing the substantial likelihood of liability only for the "three members of the Audit Committee" who approved the challenged transaction and not for the directors who did not approve the transaction).

[126] *See* Tr. at 92-93.

[127] Tr. at 93.

explained previously, the Complaint fails to allege particularized facts raising a reasonable doubt concerning the Special Committee's due care or good faith. Under these circumstances, it would be wholly unreasonable to find that any of the non-Richardson directors would face a substantial risk of liability for failing to second guess the business judgment of the Special Committee.

Turning to the October 2014 transaction, all five of the defendants were on the Board at that time. Significantly, however, the Company's certificate of incorporation has an exculpatory provision authorized under 8 *Del. C.* §102(b)(7).[128] Due to this provision, "a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts."[129] The October 2014 transaction is not, in light of this provision, "so egregious on its face that . . . a substantial likelihood of director liability exists."[130] Simply saying that demand is futile because directors would have to sue themselves is insufficient.[131]

---

[128] Special Committee Defs.' Opening Br., Ex. 5 Art. 7.

[129] *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

[130] *Friedman v. Khosrowshahi*, 2014 WL 3519188, at *10 (Del. Ch. July 16, 2014); *see also In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) ("The likelihood of directors' liability is significantly lessened where, as here, the corporate charter exculpates the directors from liability to the extent authorized by 8 *Del. C.* § 102(b)(7).").

[131] *See Brehm*, 746 A.2d at 257 n.34 ("It is no answer to say that demand is necessarily futile because (a) the directors would have to sue themselves, thereby placing the conduct

The facts alleged concerning the October 2014 transaction—which concerns shares of the Wildlife Foundation and not Richardson personally—are not so egregious as to establish a substantial likelihood of director liability for any of the members of the Board in my view. Although the Board did not follow certain procedures and failed to disclose this transaction as a related-party transaction at the time, the Report reflects—and Busch does not dispute with contrary factual allegations—that Richardson did not negotiate the timing or sale price of the shares the Company purchased from the Wildlife Foundation sold in October 2014,[132] which were purchased at a small ($.03 per share) discount to the previous day's closing price. The Complaint acknowledges, moreover, that the Company did disclose the details of this transaction and the May 2013 transactions as related-party transactions in its public filings in August 2015 (after BDO advised it to do so) while each of the defendants was on the Board and before Busch made his Demand.[133]

---

of the litigation in hostile hands, or (b) that they approved the underlying transaction.") (internal quotation marks and citations omitted).

[132] Compl. ¶ 69 (quoting Report at 22). Busch contends that, despite what the Report indicates, Richardson must have been involved in the repurchase of shares from the Wildlife Foundation in May 2013, given that the transaction occurred on the same day the Company repurchased shares from him personally. *Id.* ¶¶ 63-64. It is not alleged, however, that any of Richardson's personal shares were repurchased in the same time frame that the Company purchased shares from the Wildlife Foundation in October 2014.

[133] *Id.* ¶¶ 24-28, 67, 86.

Finally, for the same reasons explained above with respect to the May 2013 transactions, it would be equally unreasonable to find that any of the non-Richardson directors would face a substantial risk of liability for failing to second guess the business judgment of the Special Committee with respect to the October 2014 transaction given that the Complaint fails to allege particularized facts raising a reasonable doubt concerning the Special Committee's due care or good faith.[134]

\* \* \* \* \*

In sum, Busch has not alleged particularized facts demonstrating that a majority of the Board was interested or lacked independence so as to compromise the Board's impartiality to consider claims or take action concerning any of the Transactions. Thus, even if the court disregarded the fact that Busch made a litigation demand and applied the test for determining demand futility, the Complaint would be dismissed under Court of Chancery Rule 23.1.

## III. CONCLUSION

For the reasons explained above, defendants' motions to dismiss are granted. The Complaint will be dismissed with prejudice. An implementing order accompanies this decision.

---

[134] *See, e.g.*, *INFOUSA, Inc. S'holders Litig.*, 953 A.2d at 986 ("A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests.").